Mr. Phillips. Thank you, Mr. Chief Justice, and may it please the Court. In its landmark decision in Apprendi, this Court announced as a fundamental principle of Fifth and Sixth Amendment jurisprudence that every fact necessary to increase the punishment beyond that which is otherwise maximally provided for must be presented  v. United States. In this particular case, the defendant was fined a total of an $18 million penalty in the context of a jury finding that there was a single day of violation under the RCRA provision. Congress is quite explicit that the maximum fine for a single day's violation is $50,000. Was that jury trial constitutionally required? Yes, I believe that jury trial was constitutionally required, Justice Scalia. The cutoff between what's a petty offense not subject to jury trial and what's beyond that, I think you could get there two ways. This is a crime that Congress attaches a 5-year penalty to if it's against an individual, which suggests it is a very serious crime. And the maximum fine under the district judge's interpretation of this would have been $38 million, even though the judge chose only to impose an $18 million penalty under these circumstances. So either way, it seems to me clearly a serious offense. Kennedy. What have we said is the standard for fines? I'm sorry? What have we said with reference to jury trial when fines are involved? It has to be a substantial fine? Do we have a word that we use? Well, you haven't used the word. I mean, the distinction is between a serious offense and a petty offense. And the places where the draw – you know, where you've drawn the line to conclude that a fine was too small to be worried about was $10,000. In the Munoz case, you recognized in Bagwell that $52 million was way beyond what would be appropriate under those circumstances. I think the Court benefits most if it just focuses on the potential penalties that Congress has adopted and used that as the guidepost. Because if Congress has said that this is something for which someone could be – Well, you have to do that, because you have to know whether to impanel a jury before the jury comes in with – or before the jury comes in with a penalty, right? Right. Absolutely. And we asserted our right to a jury trial. The government didn't contest our right to a jury trial. And I don't actually read that brief. Do we assume for purposes of this case that your client, a corporation, has a Sixth Amendment right to a jury trial? I think the language of the Sixth Amendment couldn't be clearer, that it says in all criminal prosecutions the accused is entitled to a jury trial. And all – and, you know, Article III, Section 2 says in all jury trial – in all criminal prosecutions there is a jury trial. So there's no effort whatsoever to limit the individual or in any way the person or persons or entities that are entitled to a jury trial. What are the peers of the Southern Union Company that would sit on the jury? Other railroads? Well, that would have been – we'd probably have a different outcome if that had been the case. But no, Your Honor, obviously peers in that context is derived from the citizenry in the State or the district in which the prosecution is brought. I mean, obviously we don't get corporate peers in that sense, but no one has ever doubted that an ordinary jury would be a suitable jury of peers for corporations. And, candidly, corporations are tried all of the time. And no one has doubted it. And I don't think it – you know, first of all, it seems clear under the language of the Sixth Amendment in Article III that corporations are entitled to a jury, and that no one is – in anything that's a serious offense. And that clearly is what we have here. And so what we've got is a decision by the jury that there was at a single point in time a violation of RCRA. Well, it's not – the jury didn't say that the Defend Act was in violation only one day. It said it was in violation within this span of many months. And it didn't say how many days. It didn't say whether it was every day or one day or 10 days. It just didn't focus on the number of days. But it didn't find they were in violation only one day, which is what your opening statement was. Right. But what the First Circuit said, Justice Ginsburg, is that the most you could read the jury to have found, because it was not asked the question, the most you could read out of it was that there was a single day of a violation, and that that then sets the maximum. The most you must read out of it. The most you must read out of it. Yes. You could say it could have meant – they could have thought that they violated every day. Right. They could have. You can't say that for sure. The one thing you can say for sure is that they found that it violated it one day. Right. That's correct, Justice Scalia. And that, therefore, if you apply the core Apprendi doctrine in a principled way, as Justice Kennedy suggested in a separate concurrence, if you apply it in a principled way, you determine what facts are supported by the jury's findings and how far does the penalty take it, and it goes to $50,000, and anything beyond the $50,000 if it's found by the judge doesn't satisfy the Sixth or Fifth Amendment under those circumstances. That should be, in my judgment, the end of the inquiry. The First Circuit rejected that argument by turning to Oregon v. ICE and suggesting that there was a fundamental shift in how the Court applies the Apprendi doctrine. And I would suggest to you that although you're clearly better positioned to determine what you thought you meant by ICE than I am, my interpretation of ICE is that it deals with the very different situation of multiple offenses and the very different problem of trying to extend the Apprendi doctrine to the context of multiple convictions, and then adopted a methodology for applying it in those circumstances that focused significantly on the particular history of consecutive versus concurrent sentences. Breyer. I didn't think that. I mean, I was so — I tend to be in dissent in these cases, so I don't have the authoritative view. But the, the, my, my. More so than I do. Breyer. Well, no, but the impression I have is that, that I had thought there were what I'd call the elements of the offense, and then there were sentencing facts. And sentencing facts had been traditionally facts found by the judge when imposing a sentence. Now, the majority of the Court in Apprendi went back into the history and said there is no significant old tradition, old enough, of, of sentencing facts. So really, when you raise the sentence, that's like an element, and you should have a jury trial. Now, the argument here, one of them that the government stresses, and ICE is the same, is that there is no — the tradition is different where fines and where multiple and concurrent sentences were at issue. If you go back to the 18th century or earlier, what you'll discover is the judge has always had a much greater role in deciding what the amount of the fine should be. And therefore, insofar as that amount rested upon some view of the facts as to the manner in which the crime occurred, and it always does, it was the judge who traditionally found it, not the jury. So those facts are not like elements of the crime. Now, that's what I thought was essentially the argument. ICE and fines are on one side of that line, and Apprendi is on the other. Now, I think the, the problem with that analysis, Justice Breyer, is I don't think the history, first of all, is anywhere near as clear in this context as it was, for instance, in ICE in terms of who decided what. It is — there is no history that suggests that judges had the authority to impose fines beyond whatever the maximum statutory limit that was provided for by the legislature  And if you go through — Breyer. No, no, we're not doing that here. What they're deciding is a fact of sentencing is how often this crime was committed. No one can go against the statutory limit, but rather it allows a higher sentence when certain facts occur. Now, I thought in Apprendi that the history is just what I'm saying it was in, in the fine case. But the majority says to the contrary, and so here it seems even if I was wrong in Apprendi, it at least there is enough discretion here to say, look, this is traditionally up to the judge. Now, why do you think that isn't so? Because it never was traditionally up to the judge to go beyond whatever the maximum sentence provided was. Justice Thomas's concurrence in Apprendi spends a significant amount of time with that history. He several times references jury — I mean, fines and jury determinations and consistently fines that the same rule applies in the fine context as applies in the incarceration context. Kagan Mr. Phillips, do you think that you could say that there was no going above the statutory maximum here? In other words, you know, if the judge had said, well, it's $500 a day, I'm going to find some facts and fine you $600 a day, that would be going above a statutory maximum. But I'm wondering whether this is different, because here the judge was sticking to the $500 a day that was set out in the statute, and then the question is more, you know, of an — is it in elements or is it a sentencing fact as to how many days the violation occurred? Justice Alito Well, Justice Kagan, I would have thought, if anything, our case would be a much easier one, because what you basically are saying is that the district judge, on the basis of a nonreasonable doubt standard and without a jury, is making a determination that there have been 761 violations of Federal law, and on that basis imposing a sentence. It would seem to me that whatever else you might want to say apprentice should limit, it would be the whole idea that the judge gets to determine every aspect of all elements of the crime and the punishment that attaches to it. Ginsburg Was there an objection at trial to the charge on the ground that it didn't instruct the jury to find the number of days of violation? Justice Alito The United States didn't object to that, no, Your Honor. Actually, we didn't object to it either, and it wasn't an instruction that was offered by either of the parties. The judge, actually, is the one who defined the instruction with respect to a single case. Kennedy But this was in the context where the entire defense of the corporation was consistent with what the indictment said. It was between the dates, on or about, and it would be very strange under this evidence to think that it was only there for one day, when it was spilled and they came back. That just doesn't make any sense. Gershengorn Well, Justice Kennedy, I think that's just more to set the background. I do think we have to reach the issue you present as if it were just as if there were no evidence. Ginsburg Right.  But the government didn't allege, didn't stress waiver here. You didn't submit an instruction? Gershengorn Well, the — we didn't submit an instruction. On the other hand, neither side submitted the particular instruction that the judge adopted in this particular case. But what I think is important is to put it in the context of the evidence at trial and the way it was analyzed by the First Circuit on the harmless error standard. I mean, remember that the issue here is not that they simply have mercury in a particular location without a permit. The question was did they — were they holding it with an intent to recycle it at some point and to make it a usable product. And there were three different points in time when evidence clearly demonstrated an intent to obtain an RFP to handle the product in precisely that way, even up to the So the notion that it could be a significantly shorter period, maybe not — maybe not just a day, ultimately, but clearly you can't — we just don't know because no one asked under those circumstances. The First Circuit said this could not be viewed as harmless error, and I think that's not challenged by the United States at this stage in the litigation. And so it seems to me, as you say, Justice Kennedy, you have to evaluate the pure issue of you have one day of violation. That's the determination. And when — and to take the Apprendi doctrine, as it — as it's stated, it's quite  Sotomayor, Mr. Phillips, can you deal with one policy argument that your adversary raised that gives me some pause? And that is, the number of days is certainly something that the jury here could relatively easily decided upon.  Phillips, Right. But in fraud cases, in securities cases, sometimes the identity of victims is not determined for months until months after the conviction. And the amount of fine and — or restitution is set at sentencing. What's going to happen to all of those statutes? Because all of those procedures that have been set up by Congress to sort of set the amount of loss and repayment, are all of those subject to the Apprendi rule? I don't think so. I mean, the lower courts have been pretty consistent on the question of restitution. Restitution is, one, not a punishment within the meaning of Apprendi, and two, it's indeterminate. And as a consequence of that, the jury doesn't have to make that determination. Sotomayor, Well, isn't our fines indeterminate here by definition, going back to Justice Kagan's question? There's no upper limit to how much the fine could be here set. The upper limit is set by the number of days. But why is it different? Why is restitution different? Phillips, Because it is set by the number of days, as far as the predicate finding of how many days. Sotomayor, So how about when a fine is set by the value of the loss? That's no different than restitution. Phillips, And the government will have to figure out what is best take as to the value of the loss, and it's going to have to prove that if that's going to be the basis on which the fine is. Breyer, My goodness, I think there's lots of statutes that say something like this. Within limits, if there's a particular limit. Phillips, Well, if it's within limits, that's fundamentally different. Breyer, Leave that out, because we assume it's not. Breyer, It says the fine, the maximum fine, is going to be not more than the greater of twice the gross gain or twice the gross loss. Phillips, Right. Breyer, Now, you're going to send that to the jury. Let me read you the next phrase. Unless imposition of a fine under this subsection would unduly complicate or prolong the sentencing process. I point to that next phrase to show you that Congress understands in an antitrust case, in a RICO case, in a corruption case of different kinds, in an environmental case, it is so complicated figuring out that kinds of things that they excuse even the judge who's experienced in this from dealing with that. And under your theory, as you just point out, if Apprendi applies here, we're suddenly telling juries to, they have to, under the Constitution, administer that section 18 U.S.C. 3571, which I just read to you. Phillips, Right. Well, Justice Breyer, I mean, my first line of defense would be the comment by this Court consistently that the jury trial right doesn't necessarily make for the most efficient criminal procedure. Breyer, You know, I understand, you could say, that's what the Constitution provides, and if the jury can't handle it, well, too bad. Phillips, Okay. Breyer, But I think we're still in the business of trying to decide whether the Constitution does provide that in the case of fines. Phillips, Right. But I would hope that the Court wouldn't let the tail wag the dog in that particular context. Breyer, Is that a tale? Is that a tale, that the jury proceeding is itself so unadministerable that even Congress says we recognize even a judge couldn't do it? All right? Now, is that an irrelevant consideration when you're trying to figure out whether ambiguous history requires the jury trial? Phillips, Well, the ambiguous the part of the history that is unambiguous is the importance of the jury as a bulwark against the Federal government and against the judge. Alito, Well, in 1790, in fact, in the first Judiciary Act and in the Crimes Act of 1790, Congress enacted statutes, criminal statutes, that authorized a fine and left it entirely to the discretion of the Court. Were those unconstitutional? Phillips, If it authorized it, up to the maximum. Alito, There was no maximum. Phillips, Well, then it's an indeterminate sentence, and of course they're not unconstitutional. The core of Apprendi. Sotomayor, Congress permitted in 1790 indeterminate sentences as well, no statutory maximum for jail. Phillips, I think that's what Justice Scalia and Alito were saying. Sotomayor, So they did both, with respect to fines. Phillips, Right, they had both, but the one thing they didn't have is a situation where whatever the statutory maximum was, the judge was permitted to go beyond  of the judge. Alito, If it's totally up to the discretion of the judge, that's fine. But if Congress enacts the statutes that structures the fine, it says if this is the case, then so much, if that is the case, then so much more, then you have to have a jury trial? Phillips, Absolutely. Alito, What sense does that make? Phillips, Because you can take the case. Scalia, Isn't that precisely what Apprendi said? Phillips, Well, that was the easy answer. Scalia, Yes. Phillips, But more fundamentally, and it's demonstrated in a case just like this one. Alito, Well, that may be what Apprendi said, but is it consistent with the original meaning of the jury trial right in the Sixth Amendment? These statutes give me pause on that score. Phillips, Because these statutes don't speak to what Apprendi was talking about, which is the situation where you set a maximum above which the judge is permitted to go. None of the statutes that are out there exist that demonstrate that. And all of the language and all of the discussion in Justice Thomas' concurrence talks about up to the, you know, you have broad discretion up to the maximum. Once you go beyond the maximum, at that point, the jury trial right has to kick in. And let me say it in this context. Here's a situation where the government proves up its case in the context of a $50,000 fine, and that's what the jury is asked to decide, and it decides that, and then the judge gets to say, okay, $38 million is now the right number. If that's not the tail wagging the dog in the meaning of even the cases that preceded Apprendi, it seems to me there's a fundamental flaw in that particular scheme. The history between fines and incarceration are essentially the same. What the Court said in Apprendi should be followed exactly under these circumstances. I should be distinguished on the recognition that multiple offenses are fundamentally different from single offense. And on that basis, the judgment of the court of appeals should be reversed. Ginsburg. What you make of this old case that the government cites, U.S. v. Tyler, and it was the question of the penalty was four times the value of the goods, and this Court said the judge, not the jury, is responsible for imposing the fine and therefore also for determining the value of the goods. Tyler is in many ways kind of imponderable. The one thing is clear, it's not a Sixth Amendment decision. It wasn't actually argued. All it says is that under this law, and the problem, obviously, in this case was they found, you know, it was the pounds weren't in it, weren't the problem. The problem was, obviously, they had identified one substance in the indictment and the jury found another substance in its verdict, and so there was the disconnect there, and the Court basically said we're not going to worry about that trifling under these circumstances. What it doesn't say remotely is that the Sixth Amendment would permit the judge to make that fining under those circumstances. Kennedy, if you were to prevail, I think it would be a rather simple matter for the parties to frame an instruction, we find the defendant guilty and that the pollutant was retained for X days, much of what they do in the drug case. Kennedy, that's one way to do it. Could the government do it by the indictment? Could it indict alternatively, indicting count one for 10 days, count two for 50 days or something like that? I mean, is that the way it often works? Well, I would have thought that actually the indictment in this case was probably adequate for these purposes, because it said during the entirety of the period from September 2002 to October 2004. Well, that's why I'm surprised the government waived it, and I thought that's what the evidence showed anyway, but that's not before. That's not the way the case is presented here. Right. You're right. That's correct. How in general, I mean, in the individual case very often a trial doesn't come up, because 90 percent or more of the time it's just a question of a plea bargain, and therefore the defendant doesn't, this is an added weapon for him, apprendi. But with your clients and the others, there might be quite a lot of trials. So how in a trial does your client or others in that position defend on the ground of we didn't do this at all, but by the way, in case you decide to the contrary jury, we want to tell you we only did it Monday, Wednesday, and Friday? How is that supposed to work? Do you have two juries? No. Well, I mean, look, if we think we're going to be prejudiced as a consequence of trying this in a particular way, it will be our call whether or not to waive the jury trial right under those circumstances. But more fundamentally, at least in this particular case, obviously our position was we didn't form the intent at any point in time, but, you know, if ultimately the jury had found that there was some other point in time, then, you know, we'll deal with that issue as we deal with it. But it wouldn't have been — I don't think the trial in this case would have been significantly different. The only thing that would have been different is that the jury would have been properly instructed and our jury trial right would have been preserved. As it is here, our jury trial right has been savagely undermined. If there are no further questions, I reserve the balance of my time, Your Honor. Roberts. Thank you, Mr. Phillips. Mr. Dreeben. Mr. Chief Justice, and may it please the Court. This case, like Oregon v. Ice, involves the kind of finding that the common law never entrusted to the jury. There is, therefore, no erosion or encroachment on the jury function by assigning the function of determining the days of violation to the court for the purpose of determining the criminal fine. You agree, don't you, that the statement in Oregon v. Ice was pure dicta? The Court's statement in Ice that if a purely algebraic application of apprendi were followed, it would sweep in things such as fines and restitution was not necessary to the judgment, Mr. Chief Justice. But it was part of the Court's rationale in adopting a different take on the meaning of the word, and that is that the Court had to have a different line of cases than had previously been espoused. Mr. Dreeben, I think the reference, it was a fleeting reference to fines, and it could have meant that the judge has discretion to set the fine up to the maximum in the statute. That's one possible meaning. Dreeben, that is true, Justice Ginsburg, but I think that the author of the opinion in Ice was citing two in amicus brief filed by States, which supplied illustrations of fine statutes that it believed would be imperiled by a purely programmatic rule-based application of apprendi. And two of the State statutes that were cited in that amicus brief, that of New Jersey and Alaska, involved the kind of gain-or-loss statute that has been discussed this morning, in which the judge, following the rendition of a guilty verdict, determined the amount of gain-or-loss and then applied either a double or triple amount as the maximum fine. This would — you're not arguing that this rule will apply only to fines against corporations. It would also apply to individuals, right? Correct, Justice. It's up to the judge to decide how many days or what the value was, and so forth. Right? Yes, Justice Scalia. So the right to trial by jury to have that very important fact found does not exist, even for individuals. Justice Scalia, the tradition with respect to monetary fines is different than the tradition that the Court analyzed in Apprendi. With respect to fines, restitution, and forfeiture, the jury was never given a substantive role at common law, and the law today is, with respect to forfeiture. I'm not sure how you can fully make that argument, because I thought the history was set forth fairly clearly in Apprendi, that the early history was that nothing was given to the jury with respect to imprisonment or fines because most, if not all, sentences were indeterminate. It's only when States began, and the Federal Government, to experiment with determinate sentences, that the Apprendi issue then became live. Justice Sotomayor, I think what Apprendi relied on primarily was the linkage between charge and penalty in English law, which was, for felonies, death. The Court distinguished in a footnote the tradition with respect to misdemeanors, which it acknowledged was judicial discretion with respect to fines and whippings. And it did not rely on that history in fashioning the Apprendi rule. What it relied on were two things. First, the traditional linkage between charge and authorized penalty in English common law, and second, the tradition in America that when the legislature had put a cap on the amount of the penalty, the judge had discretion within it not to go above it. But neither of those aspects of Apprendi addressed the issue that's before the Court today, which is whether it would be an expansion beyond the domain that was covered in Apprendi to apply it to monetary penalties and other things. Sotomayor, so explain to me, other than your reliance on ICE, some sort of tradition, which, you know, we can debate whether you can draw any conclusion from tradition in any of these areas, whether it's imprisonment or fines. Tell me on the logic of Apprendi not using ICE, why fines are different? Without relying on history, which to me is – I view it as ambiguous. Dreeben, it's difficult to do that, Justice Sotomayor, because the Court fashioned the Apprendi rule from history and it limited it based on history in ICE. It doesn't operate as an algorithm that simply applies automatic. Sotomayor, I thought it was a fairly simple algorithm. It says if the statutory penalty – if a judge's fact-finding can increase the statutory penalty, then that's a violation of the Sixth Amendment. A jury has to find any fact that increases the statutory maximum. Yes. And that was the argument of the ICE dissenters, that Apprendi states a rule that does not require the impact on the States. And ICE does represent, I think, a high – shows where the high-water mark of Apprendi was. The high-water mark was respect to the penalty of imprisonment. Sotomayor, so outside of an imprisonment, there is no other penalty that Congress could fashion because it has no history that wouldn't be within the purview of the judge? Well, of course, the death penalty in Ring v. Arizona, the Court held that facts that expose a defendant to the death penalty must be found by the jury. So the Court has extended Apprendi to those core liberty areas. But even with respect to the implications for the length of imprisonment, the quantum of punishment that a defendant faces when he's convicted of multiple offenses, this Court in ITE, ICE looked to history and the impact on the administration of justice before being willing to extend Apprendi outside of its core domain. And I think it's highly relevant. But, Mr. Dreeben, wasn't the core domain defined by whether it related to a specific statutory offense? So ICE says the core concern is a legislative attempt to remove from the province of the jury the determination of facts that warrant punishment for a specific statutory offense. How is that not relevant precisely in this context? Well, it is, of course, relevant, Justice Kagan. How does that determine this context? Because the Court went on several paragraphs later in its opinion to describe what it would mean to adopt a formulaic application of Apprendi, treating it just as a rule divorced from history. And one of the consequences that the Court considered was the impact it would have on sentencing accoutrements, two of which are directly related to this case because they are financial penalties, fines and restitution. Now, I've talked about how the amicus brief that prompted that paragraph, the concern about the implications of expanding Apprendi, referred to fine statutes that operate on a gain-or-loss basis, which necessarily requires judicial fact-finding after the guilty verdict comes in. But if the Court isn't satisfied with those, restitution, which is explicitly mentioned in Apprendi — excuse me, in ICE, classically operates based on findings about victim loss that occur after the guilty verdict has come in. This Court is well familiar that oftentimes courts have to postpone sentencing in order to allow the victim to gather evidence and to present it. Now, the Court could, I suppose, do as the lower courts have done and say restitution is different because it's designed simply to compensate for loss, and therefore it's in one sense remedial. But that will have to deal with the fact that in cases like Pasquantino v. United States and Pennsylvania v. Davenport, the Court has described restitution as a criminal penalty. Now, the other way in which lower courts have said that restitution isn't swept up by Apprendi is to say it's a rule that has no maximum. Whatever the amount of harm to the victim is, that can be compensated through restitution. But again, if one is applying an algebraic understanding of the relevant statutory maximum from the Blakeley decision, restitution would be hard to justify, because the jury verdict does not contain findings about harm to victims. The jury verdict finds guilt. Afterwards, the judge finds an additional fact, namely the amount of harm and imposes  And for the Court to say that restitution is a criminal penalty, it's not. Roberts, it's kind of odd, though, isn't it? I mean, to some extent, this is a little easier case for you, because it does involve a corporation. But there are statutes where the amount of imprisonment and the amount of a fine can both increase based on a particular fact. And under your submission, if you have, you know, say a defendant who is subject to one year, and that if a particular fact is found, he's subject to two years, the fine of 20, but then 40, the judge would be constitutionally prohibited from increasing the prison sentence, but would be perfectly free to increase the fine, including in a situation where the fine might be a lot more serious than the time in prison. Probably, Mr. Chief Justice, such a statute would be construed to make that fact one for the jury, since it dictates imprisonment increases as well as fine increases. And so the constitutional question is unlikely to arise. Congress would have been deemed to have intended that that kind of a fact go to the jury. That's not the case in this statute. This statute provides a 5-year maximum penalty, and then it provides a fine amount that's graduated to the days of the violation. The violation in this case was one single violation. The judge did not find that there were multiple violations. The judge simply looked at the record, and his task is to decide how long did that violation last. He operated in a reasonable way, but we give juries the discretion to be unreasonable. It would not – juries often compromise. So if the instructions and the verdict told the jury you can find the defendant, you know, guilty for 1 day or whatever it is, the 30 million, 50,000 or 30 million, it would not be at all unusual for the jury to debate and say, well, let's find him guilty for 10 million and return that verdict. The judge is constrained by reason in a way that the jury is not, and that's sort of – that's part of the protection the Sixth Amendment provided. Dreeben, This Court has never recognized jury nullification as a constitutionally protected right. We presume a rational jury. We presume that if the jury is confronted with the evidence and the law as given it to it by the court, it will apply that law in a rational manner. And the question here is whether that is something that the jury is constitutionally entitled to do. Now, coming back to the historical foundations of the Apprendi rule and the extension that's requested here, with all due respect to Petitioner, I think United States v. Tyler is much more significant than Petitioner gives it credit for. This is a case decided in 1812 on a court that had on it Chief Justice Marshall and Justice Story. These were people who were well-steeped in common law traditions and well familiar with how judges would find facts at the time of the founding. And in Tyler, there was a charge that the defendant had unlawfully exported in violation of an embargo law an amount of pearl ashes that were worth $600. And the jury came back with a verdict that said, we find that the defendant unlawfully exported pot ashes worth $280. And the question is, could a verdict be imposed on this and could the judge set the fine? The two judges on the circuit court disagreed, and so it was certified to the Supreme Court. And this Court held unanimously that finding valuation was a judge function, not a jury function. No valuation was necessary in order for the Court to impose the proper fine. And it's difficult to understand how this Court could have said that if there were such a well-settled, constitutionally protected entitlement to a jury verdict on facts that dictated a fine, if, indeed, this statute assigned the role to the judge and the Court was fully comfortable with that role being carried out. In Tyler, as a decision of this Court, there is no decision of this Court with respect to imprisonment that is anything like Tyler. The traditions with respect to imprisonment would surely be understood in a different manner than with respect to fines. And one looks at fines, restitution, and forfeiture as a package of possible financial penalties and asks the question, did the framers envision that these matters would be within the jury's domain as opposed to the judges in imposing the appropriate sentence after a jury verdict, I think that the answer is they would not have viewed it as a matter protected by the Sixth Amendment because there was no factual predicate in the common law that would have led them to believe the jury's function would be eroded if those matters were not. Very, very simple matter for the government to ask for jury findings on the questions at issue in this case, right? We could have done it here, Mr. Chief Justice. The broader concern is cases that involve gain or loss in which the question of how much loss may have been suffered by hundreds or even thousands of victims of fraud is typically not undertaken. The process of quantifying them isn't done until the guilty verdict is in because it's an enormously difficult and complicated task. As Justice Breyer pointed out, the judge isn't even required to do it at sentencing if it proves to be too complicated. And for jury trials to do it, there may well be a need for bifurcation. And this Court in Oregon v. Ice declined to impose on the States the need to bifurcate trials to determine whether a sentence should be run consecutively or concurrently because that would intrude upon a valuable reform that was designed to provide some restraints on judicial discretion. The same kind of thing would operate here if this Court adopts an across-the-board rule that fines have to be proved to a jury if it extended it to restitution and to forfeiture. That would involve overruling the Court's decision in Libretti v. United States, which held that forfeiture is a sentencing function, but upon a strict application of apprendi, a mathematically, geometrically accurate application of the rules stated in apprendi, it's difficult to see why forfeiture is not something that has to be used. Scalia Mr. Dreeben, let's talk about Tyler. Tyler was not argued before the Court. Dreeben Correct. Scalia It's a one-page opinion. It's later described, quite accurately, as focusing not upon the amount of the fine, but rather upon a misdescription of pot ashes as pearl ashes, right? Dreeben Well, I don't agree with that it's later been characterized that way. It was characterized in a decision that was written by Justice Story in the same year. Justice Story was on Tyler. He wrote he sat on circuit in a case called United States v. Mann, and this is in our brief. And he interpreted Tyler and said the Court would not have given the direction that it did, that a judgment could be entered based on the fine amount, unless they were satisfied that an indictment lay and that the fine was to be imposed by the Court and not found by the jury as a penalty. Scalia The jury did find it in Tyler, though, didn't it? The question was submitted to the jury, wasn't it? Dreeben The jury Scalia Why doesn't that indicate what the historical practice was? Dreeben Because the Court stated that the part of the verdict which is subject to the fine, which we're discussing right now, is to be regarded as surplusage. In other words, this Tyler explains that although it was submitted to the jury, it wasn't necessary to be submitted to the jury. The charge had asked for $600 of value, which would then be subject to the fine. The jury found only $280, and as I interpret the Court's decision, and I think as Justice Story interpreted it sitting on circuit in Mann, it said this isn't a jury function. Scalia Did it as a matter of statutory construction, right? Dreeben Well, again, I would readily concede, Justice Scalia, that the Sixth Amendment does not appear in the Court's decision in Tyler, but it's difficult for me to understand that a court that included Chief Justice Marshall, Justice Story, and other members who were well familiar with how common law operated would have adopted an interpretation of a statute that was facially unconstitutional. I don't submit that this decision grapples with what we now know to be the Apprendi Doctrine. I simply submit it as evidence that this Court — Scalia You don't think they believed in the Apprendi Doctrine either, right? Dreeben No, I — they didn't have the benefit of having read Apprendi in order to re-render their decision. They were deciding the question that was certified up to them. My submission is that they wouldn't have decided the case that way if they thought based on their familiarity with the common law that fines were the kind of thing that had to go to a jury. Scalia Might have felt if they had argument, right? Dreeben I think they felt they did not need it because the matter was sufficiently obvious that all members of the Court could agree on it. Scalia What about all of the 19th century cases cited by Justice Thomas's concurrence in Apprendi? Fine cases? Dreeben Well, there are three of them. Scalia And there are three cases in which courts did indeed require the amount of the fines to be found by the jury. Dreeben There are three of them. The earliest one is Commonwealth v. Smith. It's a Massachusetts case. Scalia Massachusetts, right. Dreeben And the Court in that case, its analysis I think is even briefer than the analysis we've just discussed in Tyler. Scalia Was it an argued case at least? Dreeben Justice Scalia, I'd have to go back and look at the opinion to tell you whether it was an argued case. There is no citation of any constitutional law in that decision. Sotomayor What is the acceptable common law? Let's assume there weren't 50 States back then, but whatever the number was, 20 States, and 15 of them submitted it to the jury and 5 didn't. Does that mean there was no common law that this was generally submitted to the jury? If you can point to one case that's enough to defeat the existence of a common law? Dreeben I doubt that I would say that, Justice Sotomayor. The jurisprudence of the former colonies, new States, is not uniform. There is something I think of mythology in speaking about the common law as one indivisible body of law. Sotomayor You see, that's my problem. Dreeben And I don't disagree with you on that point, Justice Sotomayor, but I think that there is one fact that truly stands out about fines, and that is they were historically at common law products of judicial discretion. Sotomayor But so was imprisonment. Dreeben Imprisonment was rare. Imprisonment was hardly ever imposed in the early colonies and in England. Sotomayor Well, how many statutes had anything but indeterminate fine structures? How many statutes in the early common law had anything but indeterminate fine statutes? Dreeben A few did. And I've attempted to read up on the law of North Carolina, the law of Pennsylvania, the law of Massachusetts, the law of New York. It's all varied and complicated, but there were a few of them there. Scalia If it's varied and complicated, why should we, assuming that it's ambiguous, why should we adopt the strange rule that the jury has to find the fact, if you go to jail for two weeks but doesn't have to find the fact, if the amount of fines multiplied by number of days or by anything else will make a pauper of you? Why would we adopt such a strange rule? Dreeben Well, the fact that there were. Scalia And one was compelled to do so by a clear common law history. Dreeben Well, none of those statutes assigned the role of finding fines to juries. There may be an example or two that one could find if you dig through the mass of colonial records. But the dominant trend, and it was acknowledged by Blackstone, was that the common law never assigned the responsibility of fines to the jury, and statutes did so rarely. Imprisonment simply doesn't help very much in this area, because the resources required to imprison just didn't exist, and imprisonment really is a product that developed in the late. Breyer What about the other two? I just was very interested in your colloquy here. You said, well, there were three cases in the 19th century where they did save the jury, and one of them was a very brief opinion from Massachusetts. Well, Massachusetts counts in its favor, but perhaps the brief opinion doesn't. The — what about the other two? Dreeben Another one of them is Massachusetts. Breyer Both Massachusetts. Well, it's getting stronger. Dreeben There was Hope in 1845, which cites back to Smith and relied on it. And then there is an arson case called Ritchie from Indiana, in which the Court did seem to think that in order to sustain a proper prosecution where the fine amount varied based on the destruction of the property, the jury had to find the amount of the property valuation. But this is 1845. It's not something that would have been present to the mind of the framers. It doesn't indicate clearly what the source of law is, whether it's a common law tradition, whether it's following something like Smith. Smith itself, I think, is also best understood as a larceny case. And there was more of an established tradition that in larceny cases, the value of the property taken was relevant to the jury's findings because it made the difference between a capital offense, a capital offense that could be given with benefit of clergy, which was basically a way for the English judges to mitigate a death-eligible crime to a non-death penalty, or petty larceny, which was punished by fines and whippings. So it graded the offense in a way that, for example, the fine penalty at issue in this case does not. Petitioner is guilty of a felony by virtue of the jury verdict. That imposes the stigma of being a felon on Petitioner. The judge's role is then to decide what was charged in the indictment and what was the length of that violation, not to find Petitioner guilty of numerous additional violations. Scalia What if the judge disagreed with the jury about whether there was even a violation? Dreeben The jury's acquittal would end the criminal case. Scalia No, no, no, no, no. The jury finds a violation, but the judge thinks the jury got it wrong. Dreeben Well, in that case the jury finds a violation, but the judge thinks the jury got it wrong. Scalia How does he pick the number of days? Where he flips a coin? Dreeben Unless the judge finds that the evidence is insufficient under Jackson v. Virginia, he finds the jury. Scalia No, he finds it, you know, they could have come out that way, but they were wrong. Dreeben Then I think that he would be bound by the day of violation, $50,000 limit subject to another provision of Federal Law 3573C, which provides in the case of an organization that a felony exposes the defendant to a $500,000 fine. So there would be other limits applicable in Federal Law that would explain what the judge is supposed to do in that situation. The judge, of course, is operating in a different way than the jury. The jury is finding guilt beyond a reasonable doubt. The judge is applying a preponderance of the evidence standard. This Court in United States v. Watts has recognized that judges can find facts that the jury may have rejected under the higher standard. Scalia That's the whole problem. That is indeed the whole problem. Dreeben It's only the whole problem. Scalia The judge doesn't have to find that this defendant, beyond a reasonable doubt, committed the violation on so many days. The jury would. The judge can simply say, well, you know, all in all, probably they did it. Probably. More likely than not, they did it so many days. That's a big difference. Dreeben It's only a problem, Justice Scalia, if the Sixth Amendment protects a defendant's right to it. And the question that was as framed in ICE is whether the legislative innovation, the reform aimed to structure the discretion of a court, which at the founding era might have been impose whatever fine you like with no limits whatsoever, except the excessive fines clause of the Eighth Amendment. Congress has come along, as have the State legislatures, and sought to structure the deliberations with respect to financial penalties. Fines, restitution, and forfeiture are now structured in a way that basically sends the decision to the judge or lowers the standard of proof to a preponderance in the case of forfeiture amounts that are decided by a Federal jury without the constraints of the Apprendi rule. And that distinction between financial penalties and infringements on life or liberty is consistent with a Sixth Amendment theme. Deprivations of life or liberty attract a greater degree of protection than fine amounts or other financial penalties. There is substantive constitutional protection in the Eighth Amendment. Kagan What other rules do you think are different? I mean, is there a jury trial in the one case but not in the other? Is there a right to counsel in the one case but not in the other? What else turns on this fine incarceration distinction? Frederick In the right to counsel area, the Court has held that for misdemeanors, if the defendant goes to prison, he's entitled to counsel. If the defendant does not, he is not entitled to counsel. With respect to jury trials, a petty offense, which is generally one punishable by less than 6 months in prison, there is no jury trial right. A penalty of greater than 6 months in prison indicates a more serious offense. Scalia What if you call it a misdemeanor but impose a very heavy fine? Is it still a misdemeanor? Frederick It is still a misdemeanor because the primary indication Scalia And you don't have right to counsel. Frederick That is this Court's jurisprudence. This Court in Scott and Argersinger drew the line in actual imprisonment, recognizing that deprivations of liberty have a more serious criminal implication than financial penalties. Kennedy And that makes it clear to you that there's no overlap between property and liberty, so that no matter how much of your property you're taking and under what circumstances, it's just property, there's no liberty involved? Frederick There is, of course, an important constitutional value in deprivations of property. It's protected by due process, and the excessive fines clause explicitly addresses the possibility that the judge may impose an unjustified penalty. There are also nonconstitutional sources of protection, such as reasonableness review, which Petitioner got in this case, and the First Circuit upheld the amount of the fine as reasonable. The only question here is whether, despite the lack of a historical pedigree and despite this Court's decision in Tyler and despite the adverse effect on the administration of justice, the Apprendi rule needs to be expanded where it has never been applied previously to encompass fines. Kennedy But you want us to write as part of that decision that no matter how great the fine, liberty is not involved? Frederick Well, liberty in the sense of imprisonment is not involved. Corporations, I don't think, can be deprived of. Kennedy Liberty in the sense of what the Fifth Amendment and the Fourteenth Amendment say. Frederick I don't think a corporation can be deprived of liberty within the meaning of the Fifth Amendment. It can't be put in prison. It can't be restricted from, you know, activities that are common. Scalia I guess you don't need counsel in any suits against corporations, right? Frederick I don't think corporations can appear in court except through counsel. They don't have a sort of distinct. Roberts Your argument isn't limited to corporations, though. Frederick No. This is a rule that's responsive to the history with respect to financial institutions. Breyer You need any more than that? I mean, do we have to get into this? Isn't it just a question of whether there is a tradition in the law that juries rather than judges would determine what used to be called sentencing facts, facts related not to the crime but to the imposition of the punishment where that's a fine? Frederick May I answer? Justice Breyer, we're not asking the Court to reconsider its Apprendi line of cases. We're asking it to apply the analysis that limited Apprendi in Argon v. Ice. Thank you. Roberts Thank you, counsel. Mr. Phillips, you have seven minutes remaining. Phillips Thank you, Mr. Chief Justice, and may it please the Court, hopefully I'll be able to give you back a couple of those minutes. I'd like to start with what seems to me ultimately the fundamental notion of the United States position, which is that there is a vast gulf somehow between fines and imprisonment. And it seems to me very difficult within the constitutional structure to embrace that approach when obviously property interests are protected in the Fifth Amendment, they're protected in the Eighth Amendment. And if you go back to Blackstone where he talks about inflicting corporal punishment or a stated imprisonment of a term, which is better than an excessive fine for that amount's imprisonment for life, it was the recognition historically that fines have an enormous impact on individuals and, of course, are entitled to fundamental constitutional protections. It seems to me that the government's approach there to saying fines are off the table and it's completely open season on defendants under those circumstances is unjustifiable. With respect to restitution, I already suggested to the Court, all lower courts have concluded that restitution is not within the Apprendi doctrine. I don't think that's going to be a problem under these circumstances. And I don't think ultimately that the issue in this case is sort of what is or is not the common law tradition, because if I go back and I read Justice Thomas' concurrence in the history there, he doesn't even mention Tyler as part of that analysis, and yet concludes with what I think is a very powerful assessment that juries would be available for fines up to, you know, within, if it were going to go beyond some kind of a maximum. But within the maximum, obviously in that context, the judge would have complete discretion on his approach. Ginsburg's loss issue that Justice Breyer raised was very complicated to determine what the amount of the loss is. Right. Justice Ginsburg, I think it's worth considering two facts in this case in dealing with what I think is purely a policy argument that shouldn't override the Constitution. But the first one is that the notion that Apprendi applies to fines has been well accepted in 99 percent of the country for more than a decade. And the Antitrust Division operates and makes these kinds of decisions all the time. Fraud prosecutions are going forward. The amicus brief that was filed by the Chamber of Commerce demonstrates categorically they — this gets done every day, and it gets done effectively. So whatever the problem of Apprendi, it has not surfaced, and you'll look in the government's brief for any specific evidence of the complaint that it makes, other than the hypothetical possibility that the parade of horribles would play out. This Court has rejected that parade of horribles in every other Apprendi context. Ginsburg. If — on the question of the value of goods or the amount of the loss, what would the standard be? Would the jury have to find beyond a reasonable doubt that it was — that the value was such-and-such? Yes, I think that's precisely what the jury would be asked to find. And juries are asked to find that all the time, and they make that kind of a determination. And I guess the last point that I think is a practical matter that the Court ought to take notice of is that no State filed an amicus brief in this case, that Apprendi has not been the problem in the fines context that would even warrant anybody to come in here and complain about it. It seems to me the right answer is to apply the core doctrine, the core principle of Apprendi, which even the government concedes if you just take the language, talks about any fact that increases the penalty, that algorithm takes you to the conclusion the judgment below should be reversed. Sotomayor, I may have just forgotten, but does your brief go through the status of what lower courts have decided with respect to fines and how they're dealing with them? I just don't remember it as being part of your brief, the statement you just made to Justice Sotomayor. Well, we do — I mean, we do make the — we demonstrated two things, one, that the lower courts pretty consistently have rejected the First Circuit's approach, and then, two, that the, you know, the amicus brief then focused more in terms of fines being used on a regular basis in that period of time in those jurisdictions. So no further questions. I'll cede back, Mr. Chief Justice. Thank you, counsel. Counsel. The case is submitted.